**SPENCER FANE, LLP**
Richard F. Holley, Esq. (NV Bar 3077)
R. McKay Holley, Esq. (NV Bar 15934)
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Email: rholley@spencerfane.com
        mholley@spencerfane.com
Tel: (702) 408-3400 | Fax: (702) 408-3401
and
Ian M. Rubenstrunk (MN Bar 0397881)
(Admitted *Pro Hac Vice*)
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Email: irubenstrunk@spencerfane.com
Tel: 612-268-7062
and
Eric C. Peterson (MO Bar 62429)
(Admitted *Pro Hac Vice*)
1 North Brentwood Boulevard, Suite 1000
St. Louis, MO 63105
Email: epeterson@spencerfane.com
Tel: 314-333-3937

*Attorneys for NMBL Strategies, solely in its capacity*
*as court-appointed receiver in the Circuit Court of*
*St. Louis County, State of Missouri, Case No. 25SL-CC11027*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Lead Case No. 25-16697-nmc |
| LAS VEGAS COLOR GRAPHICS, INC., | Chapter 11 |
|     AFFECTS LAS VEGAS COLOR GRAPHICS, INC.  ☐ | Jointly administered with: ColorArt, LLC Case No. 25-16701-nmc |
|     AFFECTS COLORART, LLC  ☐ | |
|     AFFECTS BOTH DEBTORS  ■ | Hearing Date:  OST Pending Hearing Time: OST Pending |
|             Debtors. | Judge:  Hon. Natalie M. Cox |

### RECEIVER'S MOTION UNDER SECTIONS 543(c), 503(b)(3)(E), AND 503(b)(4) OF THE BANKRUPTCY CODE FOR PAYMENT OF REASONABLE COMPENSATION INCURRED BY CUSTODIAN AND COUNSEL

NMBL Strategies ("NMBL") in its capacity as court-appointed receiver in the Circuit

Court of St. Louis County, State of Missouri, Case No. 25SL-CC11027 (the "Receiver"), hereby

moves this Court ("Receiver's Motion") pursuant to sections 543(c) and 503(b)(3)(E) of title 11 of the United States Code ("Bankruptcy Code") for entry of an order (i) requiring payment of reasonable compensation for services rendered and costs and expenses incurred as court-appointed custodian of substantially all property of ColorArt, LLC ("ColorArt") and Las Vegas Color Graphics, LLC ("LVCG," together with ColorArt, the "Debtors"); and (ii) for such other relief deemed just and equitable.[1]

The Receiver's Motion is made and based upon Sections 543(c) and 503(b)(4) of the Bankruptcy Code; the Omnibus Declaration of Eric Moraczewski (the "Receiver Decl.") [ECF No. 32]; the Supplemental Declaration of Eric Moraczewski and exhibits thereto ("Suppl. Receiver Decl.") filed contemporaneously under LR 9014; the Memorandum of Points and Authorities set forth below; the Attorney Information Sheet for Proposed Order Shortening Time And Notice Of Hearing ("Attorney Information Sheet"), filed contemporaneously under LR 9006, and the papers and pleadings on file, judicial notice of which is respectfully requested.

### SUMMARY

|  | **NMBL Strategies (Receiver)** | **Spencer Fane LLP (Counsel)** |
|---|---|---|
| **Covered Period** | 10/1/25-11/12/25 | 10/6/25 – 11/22/25 |
| **Amount of Compensation** | $35,600 | $46,266.00 |
| **Actual, Necessary Costs** | $155.00 | $1,375.25 |
| **Total Outstanding** | $35,755 | $47,641.25 |

/ / /

/ / /

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Bankruptcy Procedure will be referred to as "FRBP." The Local Rules of Practice for the United States Bankruptcy Court for the District of Nevada shall be referred to as the "Local Rules". All references to "ECF No." are to the numbers assigned to the documents filed in the bankruptcy case identified in the caption above ("Case"), as they appear on the docket ("ECF No.") maintained by the Clerk of the Court of the United States Bankruptcy Court for the District of Nevada.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Receiver consents to the entry of a final order by the Court in connection with the Receiver's Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory and legal predicate for the relief requested herein are Sections 543 and 503(b) of the Bankruptcy Code.

### II.    APPOINTMENT OF RECEIVER

4.    On October 7, 2025, Aequum Capital Financial II, LLC ("Aequum") filed a Petition against Defendants ColorArt, LLC ("Color Art") and Las Vegas Color Graphics ("LVCG," together with ColorArt, the "Debtors") and Eran Salu ("Mr. Salu") commencing Cause No. 25SL-CC11027 ("Receivership Case") in the Circuit Court for the County of St. Louis, State of Missouri (the "Missouri Court") seeking, among other things, enforcement of loan obligations exceeding $25 million and the appointment of a receiver (the "Aequum Petition").  [Omnibus Declaration of Eric Moraczewski ("Receiver's Decl.") at ¶¶ 4-6.]

5.    On October 29, 2025, the Missouri Court entered that certain Order Appointing Receiver (the "Receivership Order") naming NMBL as receiver of the Debtors and substantially all of their property (the "Receivership Property"). [Receiver's Decl. at ¶¶ 7-10.]

6.    Pursuant to the Receivership Order, the Receiver was commanded to, among other things, immediately investigate, take possession of, hold, and liquidate the Receivership Property, including, without limitation, real, personal, tangible and intangible property, as well as documents, records, and information related thereto. [Receiver's Decl. at ¶ 11; *see also* Receivership Order at ¶ 3.]

- 3 -

### III.    RECEIVER AND COUNSEL SERVICES AND NON-COOPERATION OF THE DEBTORS

7.    As set forth more fully in the Receiver's Declaration, upon its appointment the Receiver immediately sought to gather information and secure and preserve assets.  Among other things, the Receiver and its counsel sought cooperation from the Debtors and demanded turnover of property and information (the "Turnover Request").  The Debtors were required to comply with the Receiver's requests "on demand". [Receivership Order at ¶ 4.] They did not do so despite repeated requests, discussions and correspondences from the Receiver and its counsel.  As a result of the Debtors' failure so supply needed information and cooperation, and as set forth more fully in the Receiver's Declaration, the Receiver and its counsel were compelled to seek information from other sources, to conduct independent research, and to make impromptu and other visits to the Debtor's business locations, among other things, without having first been provided keys or access to the Debtors' business premises or contact personnel at such locations. Due to the general lack of cooperation from the Debtors, and the Receiver's obligations to act quickly to preserve value for all parties in interest, the Receiver's efforts immediately following appointment were extensive. This included, without limitation, regularly scheduled, daily meetings among the Receiver and its counsel, and research of and direct communications and correspondences with identifiable financial institutions, creditors and parties in interest including, among others, landlords, trade vendors, contractual counterparties, union representatives, and others.  Such efforts would have been unnecessary had the Debtors complied with their obligations of cooperation and turnover pursuant to the Receivership Order and Mo Rev. Stat. 515.500 et seq. (the "Missouri Commercial Receivership Act" or "MCRA").

8.    The Receiver also visited ColorArt's principal place of business located at 101 Workman Road, Eureka, Missouri (the "Eureka Facility") and corresponded with the landlord of the Eureka Facility regarding rent owed by ColorArt for the month of November 2025 in the amount of $177,148.22 pursuant to the lease with ColorArt (the "ColorArt Lease"). [Receiver's Decl. at ¶¶ 16-18.]  During such visits, per the statements of staff, the Receiver learned that the Eureka Facility operated as a Marketing.com facility despite that Marketing.com was not a party

to the ColorArt Lease.  Additionally, substantial equipment owned or leased by one or both of the Debtors remained on site at the Eureka Facility. The Receiver further learned that ColorArt had or was operating out of a facility located in Des Moines, Iowa.  [Receiver's Decl. at ¶ 20.]

9.    The Receiver was tasked under Missouri Law and the Receivership Order with continuing the Debtors' businesses in the ordinary course, including paying employees.  Despite repeated requests, the Debtors did not provide the Receiver with an employee list, payroll information, or other information necessary to continue business operations in the ordinary course. [Receiver's Decl. at ¶ 21.] The lack of information created the very real possibility that employees of ColorArt were working – and thereby accruing wages – while the Receiver lacked funds to satisfy those wages.  The Receiver was, however, contacted by counsel to Graphic Communications National Pension Fund (the "Pension Fund") and Printing, Package & Production Workers Union (the "PPPW Union") and worked with the PPPW Union to gather some information relative to employees.  Pursuant to communications with the PPW Union, the Receiver was also informed that: (a) ColorArt is or may be liable for wage theft; (b) ColorArt is a party to a collective bargaining agreement with PPPWU Local Union 6-505-M of District Council 4 covering employees employed at the Eureka facility; (c) ColorArt is liable for $70,943.39 in arrearages dating to March, 2025 and  consisting of union dues withheld from employee paychecks but not remitted to the Union; and (d) ColorArt is liable for unpaid employee wages and unpaid pension contributions.  [Receiver's Decl. at ¶ 24.]

10.    In order to quickly develop a working knowledge of the Debtors' operations and to enable an analysis of potential fraudulent or otherwise avoidable cash transfers, and absent participation from the Debtors, the Receiver further compiled a "Relationship Summary" based upon publicly available information between and among the entities within a constellation of companies owned or controlled by JAL Equity Corp. ("JAL Equity") and prepared a summary chart reflecting the same.  [Receiver's Decl. at ¶ 33.]

11.    In order to prevent the depletion of funds, the Receiver in accordance with the Receivership Order, requested permission to access, view, and control the known accounts of the Debtors at Wells Fargo Bank ("Wells") and CNB Bank ("CNB").  [Receiver's Decl. at ¶ 34.]

Utilizing the available information, in combination with the Relationship Summary developed by the Receiver, the Receiver was able to quickly develop a schedule indicating that ColorArt made transfers to JAL Equity, or affiliates, subsidiaries, or insiders, in excess of $54.0 million. [Receiver's Decl. at ¶ 35.]

12.    Upon realization of control of the CNB Accounts the Receiver collected approximately $1 million into the CNB Accounts from customers of the Debtors.  The Receiver neither moved, spent, nor distributed any funds from any account.  [Receiver's Decl. at ¶ 39.]

13.    Despite the terms of the Receivership Order, vesting the Receiver with sole authority over the CNB Accounts, among other things, from October 29, 2025, through the Petition Date, the Debtors made a number of withdrawals from the CNB Accounts without prior notice to or authorization from the Receiver.  [Receiver's Decl. at ¶ 42.]

14.    Upon receipt of access to the Debtors' accounts and partial banking records, which the Receiver obtained directly from banks, without assistance or cooperation from the Debtors, the Receiver discovered that the Debtors made substantial transfers to insiders and/or affiliates totaling approximately $58,952,217.00 since December 2024 (collectively, the "Insider Transfers"). [Receiver's Decl. at ¶¶ 44-45.]

15.    Additionally, following the first and second hearings on the Receivership Motion, the Debtors made substantial transfers from the CNB Accounts. These include transfers to the Debtors' counsel (Gibson) in the following amounts (upon alerting Gibson, Dunn & Crutcher LLP of this they offered to return the transfers stating they were unaware that they had been received from ColorArt): October 14, 2025 in the amount of $200,000, and October 28, 2025 in the amount of $200,000.  [Receiver's Decl. at ¶ 46.] (Gibson agreed to return such funds to the Receiver upon being advised of the source of such payments.  However, due to the initiation of the within bankruptcy proceedings, the $400,000 transferred to Gibson was not returned before the presentation of the Receiver's motion under Section 543.)

16.    The Receiver's research further identified a number of further transactions that are difficult to explain due to the Debtors' failure to provide the Receiver with further information and access to the Debtor's accounting system. [Receiver's Decl. at ¶ 47.]

17.    Following its appointment, the Receiver, directly or through its counsel, also engaged in communications with various third parties regarding the receivership and the Debtors. As a result, the Receiver learned or was told the following:

a)    LVCG clients had become wary of utilizing the printer due to how operations have been handled;

b)    ColorArt had not been paying its freight bills creating issues with major clients;

c)    ColorArt was purportedly rebranded as Marketing.com and vendors were told that Marketing.com was just a "doing business as" for ColorArt and that all business relationships would remain with ColorArt;[2]

d)    In the last year ColorArt has lost several major clients;

e)    Operations at the facility located in Des Moines, Iowa historically supported several different clients, but was converted to exclusively support MoneyMailer, which is an entity that is also owned by JAL Equity. Fulfillment of all other client accounts were moved out of Des Moines and to other production locations in the United States;

f)    Major financial delays were purportedly caused the withdrawal of money out of ColorArt, instead of reinvesting revenue, thereby creating significant financial strain with customers and vendors;

g)    Employees were paid by JAL Equity and not ColorArt; and

h)    Vendors that were purportedly doing business with ColorArt would receive payments on ColorArt liabilities from a number of different JAL Equity related entities including but not limited to ColorArt, Marketing.com, Desert Paper, T-shirts.com, JAL Holdings, and Mr. Salu himself.

[Receiver's Decl. at ¶ 48.]

---

[2] The Receiver understands, pursuant to public records, that Marketing.com is in fact a distinct legal entity organized in the State of Missouri on or about August 25, 2022, with a principal place of business located at 101 Workman Ct, Eureka, MO 63025 or the Eureka Facility.

18.    On November 5, 2025 (the "Petition Date"), counsel for the Receiver received e-mail correspondence from the Debtors' proposed counsel, Garman Turner Gordon, LLP ("GTG"), informing the Receiver that the Debtors had filed for bankruptcy and demanding turnover of property (the "Debtor Demand"). [Receiver's Decl. at ¶ 49.]

19.    LVCG commenced its bankruptcy by filing its petition on November 5, 2025, at 6:20 p.m. CT, and commencing Case No. 25-16697 (the "LVCG Bankruptcy") and ColorArt commenced its bankruptcy by filing its petition on November 5, 2025, at 6:33 p.m. CT, and commencing Case No. 25-16701 (the "ColorArt Bankruptcy").

20.    A copy of the Debtor Demand was also sent by GTG to counsel for Aequum on the evening of November 5, 2025. On November 6, 2025, counsel for Aequum delivered correspondence via e-mail to counsel for the Receiver objecting to the Receiver taking any action to turnover or relinquish control of any Receivership Property, namely funds in the CNB Accounts, absent an order from the bankruptcy court because the cash deposits into the Debtors' accounts at Wells and CNB are the collateral of Aequum and subject to its security interest. [Receiver's Decl. at ¶ 52.]

21.    Accordingly, the Receiver's counsel spoke with Debtors' counsel, Teresa Pilatowicz, by phone and advised counsel of the information, records, and property the Receiver had, the Debtor Demand, and Aequum's objection among other things. [Receiver's Decl. at ¶ 53.]

22.    The Receiver has since returned control of the CNB Accounts to the Debtors per the orders of this Court.

**REPORTING TO THIS COURT**

23.    The Receiver's duties and obligations under MCRA as an arm of the Missouri Court dictated that the Receiver had an obligation to take all such actions "as is in the best interests of the Plaintiff and creditors and parties in interest." [Receivership Order at p. 2.] In accordance with the requirements of MCRA and the Receivership Order, the Receiver at all times diligently sought to acquire information and control of substantially all assets of the Debtors in order to prevent waste, to ensure the stability of ongoing operations, to discover the location of the Debtors' assets, to ensure compensation for the Debtors' employees, to sustain the Debtors' operations, and to

report to the Missouri Court concerning its findings, the status of estate administration, the cooperation or lack thereof of the Debtors, and the amount and location of any funds or other property transferred to insiders and affiliates such as may be necessary to maintain the Debtors' business and pay its creditors.

24. Based on the general conduct of the Debtors, their officers, and directors, including without limitation, Eran Salu, as well as the conduct thereof in the year preceding the Receivership Case, in its business judgment the Receiver developed concerns that funds put under the control of Mr. Salu, directly or indirectly, and without court supervision, may be at risk. Additionally, in its business judgment, the Receiver determined that the interests of creditors would be better served by ensuring court supervision of all operations and property of the Debtors. Finally, the Receiver was specifically directed to take possession and control of all Receivership Property until further order of the Missouri Court, which included specifically discussing the use of cash with Aequum. [Receivership Order at ¶¶ 7(d), 7(e), 29.]

25. No part of the Receivership Order excuses compliance, nor can it be stayed by the Debtors in their discretion in the event that they independently decide to consider a Chapter 11 filing.

## IV.    RELIEF REQUESTED AND THE BASIS THEREFOR

26. By this Motion, the Receiver seeks entry of an order, pursuant to Bankruptcy Code Sections 543(c), 503(b)(3)(E) and 503(b)(4).

27. Code Section 543(c) provides in relevant part that:

> The court, after notice and a hearing, shall—provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by [a] custodian[.]

28. Code Section 503(b) further provides in relevant part that:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
>
> ***
>
> (3)    the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –

\*\*\*

   (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; . . .

   (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph . . . (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant; . . .

## RECEIVER COMPENSATION AND EXPENSES

29. Attached to the Supplemental Declaration of Eric Moraczewski ("Suppl. Receiver Decl.") as **Exhibit 1** are the detailed charges and supporting materials reflecting the costs incurred by the Receiver in the Missouri Case and including motions practice seeking instruction from this Court. [*See* Receivership Order at ¶ 36 (permitting the Receiver the ability to seek instruction from the Court on its duties and obligations).]

30. In evaluating the reasonableness of the compensation and costs and expenses incurred by the Receiver as custodian, it is important to note the substantial statutory and operational duties and responsibilities that are imposed upon a general receiver immediately upon appointment pursuant to the MCRA.  Such duties were and are critical to estate preservation and, in this case, effectively prevented the Debtors from an ongoing effort to remove cash from accounts subject to the liens of Aequum.  In addition to preserving the remaining cash available in the CNB Accounts, the Receiver also collected nearly $1 million in just six days and obtained the commitment from Gibson to return an additional $400,000.

31. The MCRA embodies a comprehensive scheme for administration of operating entities, and discreet assets, under court supervision.  It divides the types of receiver into two: limited receivers and general receivers.  Mo. Rev. Stat. § 515.515.

32. A general receiver is a receiver "appointed to take possession and control of all or substantially all of the [D]ebtors' property."  As is the case in proceeding under Title 11, the term "property" is expansive and includes "any right, title, and interest of the debtor, whether legal or equitable, tangible or intangible, in real and personal property, regardless of the manner by which

such rights were or are acquired, . . . Property includes, but is not limited to any proceeds, products, offspring, rents, or profits of or from property." Mo. Rev. Stat. § 515.505(17).

33.     A general receiver also is tasked with performing a broad range of duties, some of which must be accomplished within a short period of time.  For instance, under MCRA, the Receiver must, within ten (10) days of appointment, obtain a full and complete list of creditors and other stakeholders of the Debtors, and give notice of the Receiver's appointment to all such parties in interest[3], including also any regulators, and taxing authorities, by first-class United States mail. Where, as here, Debtors are uncooperative and decline to grant access to their accounting system, that task becomes materially more difficult as the Receiver must engage in independent research to locate and correspond with creditors and potential claimants. A general receiver must also publish notice of its appointment by publication. Mo. Rev. Stat. § 515.520.  The duties of a general receiver further extend to all aspects of the operation of a debtor's business. [Receivership Order at ¶ 5(a).] A general receiver appointed under MCRA displaces the pre-receivership executive authority and management and replaces it. *See* MCRA Section 515.540.1 ("Except as otherwise provided for by sections 515.500 to 515.665, the court in all cases has *exclusive* authority over the receiver, and the *exclusive* possession and right of control with respect to all real property and all tangible and intangible personal property with respect to which the receiver is appointed") (emphasis supplied)

34.     While this affords a general receiver the full executive power over a debtor and its operations, it also can be hindered by an uncooperative debtor.  It is necessary for a general receiver in Missouri to act quickly to secure information and assets necessary to sustain business operations, pay creditors, insure property, and prevent waste – a job that is made significantly more difficult where there is not debtor cooperation.

35.     In Missouri, a general receiver's powers and duties include, expressly, the ability to incur and pay expenses incidental to the preservation and use of estate assets, to do all the things

---

[3] The term "party in interest" is similarly broad and includes the debtor, any party to the case, the receiver, any person with an ownership interest in or lien against estate property, any person that has an interest in estate property, all creditors, and any person whose interest in estate property may be affected.  Mo. Rev. Stat. § 515.505(15).

that the debtor or owner of a business may do in the exercise of ordinary business judgement, to assert the debtor's rights and claims and enforce the same, to intervene in pending litigations, to pursue avoidance of certain fraudulent or other avoidable transfers, to notify taxing and regulatory authorities, and to take all actions necessary or appropriate to enforce the terms and provisions of the order of appointment. *See* Mo. Rev. Stat. § 515.545.

36. To meet and effectively administer the transition of management from the Debtors to the Receiver, speed is imperative when an operating company is involved. Where funds are lacking, developing a budget based on reliable information to present to the plaintiff or other entity who will fund a Receivership is also critical.

37. To perform effectively, a Receiver must be qualified, experienced, and must have qualified counsel and others engaged immediately. The Receiver must secure a business and its operations in all respects including operational, financial, and regulatory, and must quickly identify vendors, employees, insurers, landlords, and others necessary to maintain operations and protect against waste.

38. A Receiver must also prepare budgets for filing with the court and file schedules, issue litigation stay notices, and work with employees and managers to ensure satisfactory ongoing operations. In that manner, the initiation of a MCRA Receivership resembles preparations for a chapter 11 estate administration.

39. Where, as here, a debtor is uncooperative, the Receiver must further conduct independent fact-finding, research, and court action to ensure that its duties are met and to hold the Debtors to account. Where out-of-state property is implicated, the Receiver may also engage counsel in foreign jurisdictions and initiate ancillary receivership proceedings in those states where estate assets are found.

40. MCRA further affords the appointing court broad discretion in tailoring an appointment order to meet the circumstances of a given case.

41. Here, the Missouri Court required the Receiver within ten (10) days to develop an initial 30-day budget to ensure satisfactory maintenance of business operations, and within thirty (10) days to develop a 6-month operating budget. The Receivership Order further commanded the

Debtors, among others, "upon demand by the Receiver . . . [to] turn over Receivership Property that is within the possession or control of that person . . ." [Receivership Order at p. 5, ¶ 4.]  Here, and as set forth above, the Debtors did not do so despite demand.

42.    The Receivership Order further provides that " . . .the failure to relinquish possession and control to the Receiver shall be punishable by contempt of Court."  Had this case not been filed, the Debtors would have faced the possibility of such sanctions.

43.    Finally, in order to meet its obligations to the Receivership Court and to this Court, and faced with conflicting demands asserted by the Debtors and Aequum, the Receiver became obligated to timely seek court direction by motions practice respecting property over which the Receiver had secured control as an arm of the Missouri Court, and to present initial findings and information that would enable this court to make an informed determination upon considering any perceived risks that may be associated with re-vesting the Debtor with control.  Such efforts further the interests of the bankruptcy estates and the Receivership. They also helped ensure that all tribunals were adequately informed and ensured that the requirements of both the Missouri Court and this Court were honored.

**THE RECEIVER'S REQUESTED COMPENSATION IS REASONABLE**

44.    Code Section 543 requires payment of reasonable compensation for services rendered and costs and expenses incurred by a custodian such as the Receiver.

45.    As described at 3 Norton Bankr. L. & Prac. 3d §62:13:

> The factors that are considered in determining whether a custodian's compensation is 'reasonable' are similar to those used to determine if the compensation of an attorney or accountant under Code § 503(b)(4) is reasonable.  These factors include:  The time and labor expended by the custodian, the benefit of the custodian's services to the debtor and the estate, the size and/or complexity of the estate, what the custodian would have received if it had been appointed as trustee for the debtor, and the quality of the custodian's services. The amount of compensation to which the custodian would have been entitled had there been no bankruptcy can serve as a guide to the [C]ourt, the [C]ourt is nevertheless required to exercise independent judgment in the determination of the reasonableness of the compensation.  The custodian must present sufficient evidence to support the requested compensation.

46.    In the instant case, all services, costs and expenses satisfy the requisite reasonableness standard.  *In re Internet Specialties West, Inc.*, 2013 WL 4408456 at * 4 (Bankr. C. D. Cal.), *citing In re 400 Madison Ave. Ltd. P'shp.*, 213 B.R. 888, 898 (Bankr.S.D.N.Y.1997)); *see also Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993) ("the district court must first determine the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate").

47.    The time and labor expended by the Receiver total 112.75 hours.  The work performed is set forth in the detailed time entries attached as Suppl. Receiver Decl. at **Exhibit 1**. Such fees and expenses are set forth in a manner consistent with the Receiver's extensive practice in Missouri and elsewhere and are of a kind, nature, and amount that would be customary and usual in a receivership administration under MCRA.  The hourly rate charged by the Receiver is set forth in the Receivership Order at p. 14, ¶ 17, and is established as $375 per hour. *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622–23 (9th Cir. 1993) ("If the applicant satisfies its burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee....") (citation omitted).

48.    All of the time and labor expended by the Receiver benefitted both the receivership and the within bankruptcy estates, was necessary to estate administration, was performed quickly and efficiently, and was effective in developing facts and information critical to satisfaction of the Receivership Order and its requirements, to maintaining the Debtors' operations, to discovering the latent *modus operandi* of the Debtors and interwoven business practices of the constellation of companies within the JAL Equity population of firms. Such work by the Receiver also added value to the bankruptcy estates by quickly and efficiently identifying potentially avoidable transfers or other claims the Debtors may have against insiders, or other third parties, for the benefit of all creditors. *See, e.g.,* Sections 544, 547, and 548.

49.    Such efforts were also effective and preserved estate assets.  Pre-petition, the Receiver prevented ongoing diminution of the Debtors' bank accounts, collected nearly $1 million, obtained the agreement from Gibson to return an additional $400,000, identified key managers, engaged with unions and stakeholders and conducted independent research to develop an

employee list, creditor list, litigation list and other matters.  The Receiver further engaged the Debtors, though counsel, in demanding and reiterating demands for turnover of estate property, including information and accounting system data, developed an understanding of ongoing insurances and coverage needs, communicated with Aequum as senior lender respecting information collected, worked with financial institutions to ensure all cash was preserved, researched the Debtors' history and the transition of its business from ColorArt to Marketing.com, and prepared reports for filing with the Missouri Court in advance of the then-upcoming November 20 case status conference at which the Missouri Court would evaluate the Debtors' compliance with the Receivership Order. *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995) (explaining that an administrative expense claimant under 11 U.S.C. § 503 must demonstrate a benefit to the estate.)

50.    The  compensation due to the Receiver for services rendered, together with its costs and expenses, are set forth in detail in the invoices attached to the Suppl. Receiver Decl. at **Exhibit 1**.

51.    All such compensation and reimbursements were actual and necessary, particularly in view of the Debtors' lack of cooperation and in consideration of the obligations placed upon the Receiver through the Receivership Order.  As such, compensation in the amount of $35,600 together with reimbursement of costs in the amount of $155 should be allowed.

**COMPENSATION OF RECEIVER'S COUNSEL SHOULD BE ALLOWED**

52.    Likewise, compensation for services rendered and expenses incurred by counsel satisfies the requisite standard.  Detailed descriptions of such services are set forth at **Exhibit 2** to the Suppl. Receiver Decl.

53.    The factors that Courts consider in determining whether the compensation of an attorney for a custodian under Code Section 503(b)(4) is reasonable likewise include the time and labor expended, the benefit of the services to the debtor and the estate, the size and/or complexity of the estate, what counsel would have received if the Receiver had instead been appointed as trustee for the debtor, and the quality of the services provided.  *See, e.g.,* 3 Norton Bankr. L. & Prac. 3d §62:13; *see also, In re China Village, LLC*, 2012 WL 32684 at * 11 (Bankr. C. D. Cal.)

("[T]he receiver's counsel is entitled to reasonable compensation under § 503(b)(4) of the Bankruptcy Code."); *see also In re Schweitzer, Inc.*, 1999 WL 34754110, at \*4 (Bankr. D. Idaho Jan. 8, 1999) ("First, the presumptive 'lodestar' amount is determined by multiplying the number of reasonable hours expended in the matter by the reasonable hourly rate. In the second part, a court may adjust this presumptively reasonable lodestar amount based on a variety of factors expressed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975).") (internal citations omitted).

54.    Spencer Fane, counsel for the Receiver, is highly experienced in receivership matters nationally and internationally and, in particular, in Missouri under MCRA.  Receiver's counsel lead the subcommittee of the Missouri Bar in crafting the Missouri Commercial Receivership Act, testified at all testimonial hearings before the Missouri legislature in winning passage of MCRA, and frequently teach receivership under MCRA at annual judicial colleges in Missouri.  Receiver's counsel also practices regularly as counsel for MCRA receivers, having administered dozens of cases under the statute and at times also acts as receiver. As such, compensation in the amount of $46,641.25 together with reimbursement of costs in the amount of $1,375.25, should be allowed.

55.    The rates charged by counsel are the standard rates charged by Spencer Fane in its receivership practice.

56.    The time spent totaling 71.30 hours, as detailed in **Exhibit 2**, was all actual and necessary to counsel the Receiver regarding satisfaction of the provisions of the Receivership Order and MCRA, and directed at attaining an operational understanding and capability of the Receiver to quickly transition into management of the Debtors' complex business and structure. *See, e.g., In re Alcala*, 918 F.2d 99, 103 (9th Cir. 1990) (discussing the "reasonable" and "necessary" standard for payment of fees under 11 U.S.C. § 330).

57.    The estates have benefitted from such efforts.  The preservation of cash, the agreement to receive an additional $400,000 from Gibson, and the collection and sharing of information with stakeholders and the Missouri Court all were furthered by the participation of counsel.  As a result of counsel's efforts, along with the Receiver's efforts, the bankruptcy estates

had access to nearly $2 million. Based on information gathered by the Receiver and its counsel, as well as testimony from Mr. Salu, it appears likely that such funds would have been otherwise depleted by the pre- and post-Receivership Order actions of the Debtors to remove cash from the estate.

58.    In determining the amount of reasonable compensation to be awarded the court may further consider the nature, the extent, and the value of such services, taking into account all relevant factors, the time spent on such services, the rates charged for such services, whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, estate administration. *See In re Schweitzer, Inc*., 1999 WL 34754110, at *4 (Bankr. D. Idaho Jan. 8, 1999). As set forth above, the efforts of counsel satisfy such requirements.

59.    Here, each of the Receiver and Spencer Fane respectfully submit that the services for which it seeks compensation were, at the time rendered, believed to be necessary for, beneficial to, and in the best interests of, the Debtors and their stakeholders, were in keeping with, and in furtherance of the directives of the Missouri Court, and were statutorily required pursuant to the MCRA and the Receivership Order. Spencer Fane and the Receiver each worked diligently to preserve and maximize value of the Debtors' estates. Nearly one million dollars were collected, and preserved, in the six days during which the Receiver was in office. Indeed, the Debtors had sought nearly $800,000 to make payroll but later sought authority from this Court to pay only a small percentage of the original request. Had the Receiver not taken control of the accounts, it is possible that nearly all cash would have been expended on expenses that may not have been expenses of the Debtors.

60.    No money was spent from any of the Debtors' accounts in achieving these results, whereas prior to the Receivership Order, the Debtors appear to have been aggressively shifting cash beyond the reach of creditors.

61.    Moreover, and as noted above, the Receiver with the aid of Spencer Fane, developed a factual record that has been used by the Debtor and Aequum in this case to inform the Court of the nature and scope of pre-petition actions, cash transfers, and conduct of the Debtors.

The Receiver and Spencer Fane also developed a constellation chart based on independent research illustrating the complex and interwoven population of non-Debtor affiliates, conducted interviews and investigations, drafted motions and pleadings for this court and for the Missouri Court, performed independent research and worked with unions, creditors, landlords, and others in developing a means of estate administration in light of the lack of fulsome cooperation from the Debtor contravening the Receivership Order. All of this work provides a benefit to and can be utilized by the Court, creditors, and parties in interest in enforcing and applying a variety of sections of the Bankruptcy Code.

62. The Receiver and Spencer Fane also developed a discovery plan, identified a variety of potential avoidance actions, and discovered and evaluated claims of wage theft, nonpayment of rent, equipment lease defaults, and pressed the Debtor for responsive documents and information from the Debtors' books and records as necessary to properly administer an MCRA receivership estate.

63. Though the time period in which the Receiver was in office was brief in duration, the costs, fees and expenses were higher than normal due to refusal by the Debtors to provide simple access to the Debtors' accounting system and employee roster, among other things.

64. As such, the services rendered by the Receiver and Spencer Fane were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved.

65. Spencer Fane has a reputation for its expertise and experience in financial and bankruptcy reorganizations and restructurings, including receiverships, and as noted above, the compensation is reasonable based on customary compensation charged by other practitioners in non-bankruptcy cases.

66. Based on an application of the above factors, the Receiver and Spencer Fane each respectfully submits that the compensation requested herein is reasonable in light of the nature, extent, and value of such services to the Debtor and stakeholders and to this Court and the Missouri Court. Accordingly, that approval of the compensation sought herein is warranted.

/ / /

## V.    <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth herein, the Receiver respectfully requests that this Court enter an order, substantially in the form attached hereto, granting the relief requested in the Motion and for such other relief deemed just and equitable.

Dated this 26th day of November 2025.

SPENCER FANE LLP

   /s/ R. McKay Holley
RICHARD F. HOLLEY, ESQ. (NBN 3077)
R. McKAY HOLLEY, ESQ. (NBN 15934)
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Phone: (702) 408-3400 | Fax: (702) 408-3401
Email: rholley@spencerfane.com
         mholley@spencerfane.com
and
Ian M. Rubenstrunk (MN Bar 0397881)
(Admitted *Pro Hac Vice*)
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Email: irubenstrunk@spencerfane.com
Tel: 612-268-7062
and
Eric C. Peterson (MO Bar 62429)
(Admitted *Pro Hac Vice*)
1 North Brentwood Boulevard, Suite 1000
St. Louis, MO 63105
Email: epeterson@spencerfane.com
Tel: 314-333-3937

*Attorneys for NMBL Strategies, solely in its capacity as court-appointed receiver in the Circuit Court of St. Louis County, State of Missouri, Case No. 25SL-CC11027*

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Spencer Fane LLP and that, on the 26th day of November 2025, I caused to be served a true and correct copy of the

RECEIVER'S MOTION UNDER SECTIONS 543(c), 503(b)(3)(E), AND 503(b)(4) OF THE BANKRUPTCY CODE FOR PAYMENT OF REASONABLE COMPENSATION INCURRED BY CUSTODIAN AND COUNSEL in the following manner:

☒    (ELECTRONIC SERVICE) Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐    (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date written above.

☐    (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date written above.

☐    (FACSIMILE) By serving a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those listed on the attached service list, and on the date written above.

　/s/ Olivia Swibies　　　　　
An employee of Spencer Fane LLP