David Riggi, Esq.
Nevada Bar No. 4727
riggilaw@gmail.com
**RIGGI LAW FIRM**
7900 W. Sahara Avenue, Suite 100
Las Vegas, NV 89117
Telephone: (702) 463-7777
Facsimile: (888) 306-7157

*Counsel to Knepper Press Corporation,*
*Husky Envelope, LLC, Response Envelope, Inc.,*
*Southland Envelope, LLC, Anchor Graphics, and*
*Breese Publishing Company*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>**LAS VEGAS COLOR GRAPHICS, INC.,**<br><br>☐ AFFECTS LAS VEGAS COLOR GRAPHICS, INC.<br>☒ AFFECTS COLORART, LLC<br>☐ AFFECTS BOTH DEBTORS<br><br>Debtors. | Lead Case No.: 25-16697-nmc<br><br>Chapter 11<br><br>*Jointly administered with:*<br>ColorArt, LLC,<br>Case No. 25-16701-nmc<br><br>Hearing Date: TBD<br>Hearing Time: TBD |

**OMNIBUS MOTION FOR ENTRY OF ORDER**
**ALLOWING ADMINISTRATIVE EXPENSE CLAIMS OF**
**KNEPPER PRESS CORPORATION, BREESE PUBLISHING COMPANY,**
**HUSKY ENVELOPE, LLC, ANCHOR GRAPHICS,**
**RESPONSE ENVELOPE, INC., AND SOUTHLAND ENVELOPE, LLC**

Knepper Press Corporation ("Knepper"), Bass Company, LLC dba Breese Publishing ("Breese"), Husky Envelope, LLC ("Husky"), Anchor Graphics, Inc. ("Anchor"), Response Envelope, Inc. ("Response"), and Southland Envelope, LLC ("Southland," and together with Knepper, Breese, Husky, Anchor, and Response, the "Claimants"), by and through their undersigned counsel, hereby move (the "**Motion**") the Court, pursuant to 11 U.S.C. § 503(b)(1)(A), for entry of an order substantially in the form attached hereto as **Exhibit A** (the

1

"**Proposed Order**") allowing each Claimant's post-petition claims against the bankruptcy estate of ColorArt, LLC as administrative expenses entitled to priority under 11 U.S.C. § 507(a)(2).

In support of this Motion, the Claimants rely on the *Declaration of Eran Salu in Support of Omnibus Motion for Entry of an Order Allowing Administrative Expense Claims* (the "**Salu Declaration**"), submitted herewith pursuant to Local Rule 9014 together with the schedules and supporting documents attached thereto as **Exhibits A through I**; the papers and pleadings on file herein; the memorandum of points and authorities set forth below; and any oral argument the Court may entertain at the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    JURISDICTION, VENUE, AND AUTHORITY.

The United States Bankruptcy Court for the District of Nevada (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a) and 503(b)(1)(A) of title 11 of the United States Code (the "Bankruptcy Code").

## II.    BACKGROUND.

*A.    The Chapter 11 Cases.*

On November 5, 2025 (the "**Petition Date**"), Las Vegas Color Graphics, Inc. ("LVCG") and ColorArt, LLC ("ColorArt," and together with LVCG, the "Debtors") each commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By order of this Court, the Chapter 11 Cases are being jointly administered for procedural purposes only; the Debtors' respective estates remain separate. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no trustee or examiner has been appointed; an Official Committee of Unsecured Creditors has been appointed.

The relief requested by this Motion is sought solely and exclusively against the bankruptcy estate of ColorArt. The Claimants do not, by this Motion, seek any relief against the

estate of LVCG, and the allowance and priority of the administrative expense claims set forth herein shall be determined and entered against ColorArt's estate only, notwithstanding the joint administration of the Chapter 11 Cases.

## B.    The Claimants.

Each Claimant is a separate operating company that does business in its own name, maintains its own books and records, owns its own accounts receivable, and bills its own customers. Salu Decl. ¶¶ 6–6(a). Each Claimant has separately authorized the filing of this Motion as to its own claim, and no accounts receivable, claims, or rights of recovery have been pooled, assigned, contributed, or otherwise transferred among the Claimants for purposes of this Motion. Salu Decl. ¶ 6(b).

Each Claimant has, both before and after the Petition Date, supplied commercial printing, envelope manufacturing, publishing, mailing, or graphics services to ColorArt in the ordinary course. Salu Decl. ¶¶ 7–8. Each Claimant's administrative expense claim is its own; the Claimants are not asserting a single, joint, or pooled claim, but rather six separate claims for allowance against ColorArt's estate (with Anchor asserting a seventh, distinct claim with respect to the Retained Card Receipts described in Part II.E below).

## C.    Post-Petition Services Rendered to ColorArt.

Between the Petition Date and March 4, 2026, the Claimants rendered post-petition goods and services to ColorArt reflected in 109 separate post-petition invoices, with an aggregate open balance of **$889,102.88** (collectively, the "**Post-Petition Invoices**"). Salu Decl. ¶¶ 9–15 & Exs. A–F. The Post-Petition Invoices were issued in the ordinary course of dealing between the Claimants and ColorArt, on the same terms and pricing as had governed the parties' pre-petition course of business, and were rendered to enable ColorArt to fulfill its obligations to its own end customers. *Id.* ¶¶ 7–8. The Post-Petition Invoices break down by Claimant as follows:

| Claimant | Open Balance | Invoices | ColorArt's Customer Billing | Matched |
|---|---|---|---|---|
| Knepper Press Corporation | $585,337.08 | 93 | $964,672.13 | 71 of 93 |

3

| Bass Company, LLC dba Breese Publishing | $264,819.04 | 2 | $254,393.14 | 1 of 2 |
|---|---|---|---|---|
| Husky Envelope, LLC | $18,054.60 | 2 | $40,458.00 | 2 of 2 |
| Anchor Graphics, Inc. (trade invoices) | $10,038.70 | 10 | $2,455.00 | 4 of 10 |
| Response Envelope, Inc. | $9,995.40 | 1 | — | — |
| Southland Envelope, LLC | $858.06 | 1 | $1,961.67 | 1 of 1 |
| **TOTAL** | **$889,102.88** | **109** | **approx. $1,263,940** | **79 of 109** |

The Claimants acknowledge that ColorArt has identified a single charge in the amount of **$4,978.82** (Uline Invoice No. 200379104, dated November 10, 2025), originally billed to ColorArt and shipped to Knepper, that the Claimants concede may properly be offset against Knepper's post-petition trade claim. After giving effect to that offset, the net aggregate open balance of the Post-Petition Invoices is **$884,124.06**, and Knepper's individual net claim is **$580,358.26**. Salu Decl. ¶ 15.

Significantly, the Post-Petition Invoices do not arise out of, and are not anchored in, any pre-petition contractual commitment. There is no master services agreement, requirements contract, standing purchase order, pricing arrangement, or other pre-petition arrangement obligating ColorArt to place orders with the Claimants or obligating the Claimants to perform any specified volume of work for ColorArt after the Petition Date. Salu Decl. ¶ 8(a). Each Post-Petition Invoice was issued in response to a discrete purchase order placed by ColorArt with the relevant Claimant *after* the Petition Date, accepted by the Claimant after the Petition Date, and reflecting goods or services then ordered and to be performed in the ordinary course. Salu Decl. ¶¶ 8(b)–8(c). Each Post-Petition Invoice identifies the specific ColorArt customer, job number, and/or purchase order number to which the work relates, on the face of the invoice. Salu Decl. ¶ 8(d) & Exs. A–F.

**D.      *The Estate Re-Billed the Same Work to Its End Customers.***

ColorArt accepted the goods and services reflected in the Post-Petition Invoices, used them to fulfill its own customer orders, and invoiced those end customers for the same work.

Salu Decl. ¶¶ 8, 19 & Ex. H. As reflected in the table above and in greater detail in **Exhibit H** to the Salu Declaration, ColorArt re-billed its end customers in the aggregate amount of approximately **$1,263,940** on the 79 Post-Petition Invoices for which ColorArt's downstream billing has been

identified to date. Salu Decl. ¶ 19. With respect to the remaining 30 Post-Petition Invoices, ColorArt's corresponding customer invoices have not yet been produced to the Claimants, but each such invoice identifies on its face the specific ColorArt end customer, job number, or purchase order to which the work relates, confirming that the goods or services were performed for an identified ColorArt customer order. Salu Decl. ¶¶ 8(d), 20 & Exs. A–F. The matched downstream-billing detail is offered as corroborating evidence of the benefit conferred on the estate; the legal sufficiency of that benefit, however, does not depend on a one-for-one match between a Post-Petition Invoice and a corresponding ColorArt customer invoice, because in either case the Claimants' goods and services were necessary operating inputs that enabled ColorArt's continued post-petition operations. Salu Decl. ¶¶ 8, 19–20.

### E.      *Anchor Graphics' Post-Petition American Express Card Receipts.*

Separate and apart from the trade-invoice component described above, Anchor seeks allowance of an administrative expense claim in the amount of **$77,517.40** representing the proceeds of 87 post-petition American Express card transactions that ColorArt processed and retained between the Petition Date and April 1, 2026. Salu Decl. ¶¶ 16–17 & Ex. G.

The card payments were made by Anchor's own customers, on Anchor's account, and represented payments owed to Anchor for goods and services that Anchor had supplied or contracted to supply to those customers. Salu Decl. ¶ 16. Pursuant to a pre-existing intercompany processing arrangement, ColorArt administered Anchor's American Express merchant processing through ColorArt's card-processing infrastructure, with the resulting settlement proceeds to be remitted to Anchor in the ordinary course. Salu Decl. ¶ 16(a). After the Petition Date, ColorArt continued to process and receive the settlement proceeds of Anchor's card transactions, but failed to remit those proceeds to Anchor. Salu Decl. ¶¶ 16(b)–17. The 87 transactions are identified by transaction date, transaction identifier, cardholder customer name,

last-four digits of the card, and settlement amount on the schedule attached as **Exhibit G** to the Salu Declaration. Salu Decl. ¶ 17.

### F.    *Aggregate Relief Sought.*

Taken together, the Claimants seek allowance of administrative expense claims totaling **$961,641.46** against the ColorArt estate (representing a gross aggregate of $966,620.28 less the conceded Uline offset of $4,978.82 described in Part II.C above), allocated among the Claimants as set forth in the table in Part II.C above and, with respect to Anchor's retained-card-receipts component, as set forth in Part II.E above. Salu Decl. ¶¶ 15, 18. The trade-invoice component (Parts II.C–D) and the retained-card-receipts component (Part II.E) rest on independent factual and legal grounds; the Court may allow either component without allowing the other, and the relief requested as to each is severable from the relief requested as to the other.

### G.    *Demand and Non-Payment.*

The Claimants have demanded payment of the Post-Petition Invoices and remittance of the Retained Card Receipts in the ordinary course of business. Salu Decl. ¶ 21. None of the Post-Petition Invoices has been paid; the Retained Card Receipts have not been remitted. *Id.*

### III.    THE CLAIMANTS' POST-PETITION TRADE CLAIMS QUALIFY AS ADMINISTRATIVE EXPENSES UNDER 11 U.S.C. § 503(b)(1)(A).

### A.    *The Statutory Framework.*

Section 503(b)(1)(A) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses … including — (1)(A) the actual, necessary costs and expenses of preserving the estate, including — (i) wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Administrative expenses are afforded the second-highest priority among claims in a chapter 11 case and must be paid in full, in cash, on the effective date of any chapter 11 plan, unless the holder agrees to different treatment. *See* 11 U.S.C. §§ 507(a)(2), 1129(a)(9)(A).

The animating purpose of section 503(b) is "to facilitate the operation of the debtor-in-possession's business, with a view to rehabilitation," by ensuring that third parties who deal with the debtor in possession will be paid ahead of pre-petition creditors. *Reading Co. v. Brown*, 391

6

U.S. 471, 475 (1968); *see also In re Abercrombie*, 139 F.3d 755, 757 (9th Cir. 1998). The administrative expense priority is construed narrowly so as to maximize value to the estate as a whole, *In re Palau Corp.*, 139 B.R. 942, 944 (B.A.P. 9th Cir. 1992), *aff'd*, 18 F.3d 746 (9th Cir. 1994), and the claimant bears the burden of demonstrating, with concrete evidence, that the expense was actually and necessarily incurred to preserve estate value. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999). At the same time, the priority must be available where the statute's purpose is served, lest debtors and their estates be unable to obtain post-petition goods and services on ordinary commercial terms.

### B.        The Ninth Circuit's Two-Part Test.

The Ninth Circuit has adopted the test originally articulated by the First Circuit in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976). Under that test, a claim is entitled to administrative expense priority under section 503(b)(1)(A) where the claimant establishes that the claim:

> (1) arose from a transaction with the debtor-in-possession (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and

> (2) directly and substantially benefited the estate.

*Abercrombie*, 139 F.3d at 757; *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus.)*, 66 F.3d 1091, 1094 (9th Cir. 1995); *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706–07 (9th Cir. 1988). The bankruptcy court is afforded "broad discretion" in applying the test. *Dant & Russell*, 853 F.2d at 707.

### C.        Element 1: The Post-Petition Invoices Arose from Post-Petition Transactions with the Debtor-in-Possession.

Each of the 109 Post-Petition Invoices was issued for goods or services that the Claimants supplied to ColorArt *after* the Petition Date, on discrete individual post-petition purchase orders accepted by ColorArt in its capacity as debtor in possession. Salu Decl. ¶¶ 8(a)–8(d), 9–15 & Exs. A–F.

7

Critically, the Post-Petition Invoices are not anchored in any pre-petition commitment. The Claimants and ColorArt had no master services agreement, requirements contract, standing purchase order, or other pre-petition arrangement obligating either party to deal with the other after the Petition Date. Salu Decl. ¶ 8(a). The obligations at issue therefore stand in marked contrast to the post-petition obligations denied administrative priority in the cases on which an objector might rely. *Cf. DAK*, 66 F.3d at 1094–95 (denying administrative priority because "Microsoft's entire debt to [the debtor] arose prepetition" under a license agreement signed pre-petition); *In re Jartran, Inc.*, 732 F.2d 584, 587–88 (7th Cir. 1984) (post-petition publication of advertisements did not generate administrative claim where the relevant publication commitments were made pre-petition); *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992) (post-petition attorney's fees not entitled to administrative priority where right to fees originated in a pre-petition contractual provision); *Abercrombie*, 139 F.3d at 757 ("the DAK inquiry … focuses on whether the contract giving rise to the claim was entered into before or after the bankruptcy petition"). Here, the obligations giving rise to the Post-Petition Invoices originated, in each instance, from a discrete post-petition order placed by ColorArt after the Petition Date and accepted by the Claimant after the Petition Date. Salu Decl. ¶¶ 8(b)–8(c). The first element of the *Mammoth Mart* test is therefore satisfied as to each of the Post-Petition Invoices.

## D.    Element 2: The Claimants' Post-Petition Services Directly and Substantially Benefited the Estate.

The second element — direct and substantial benefit to the estate — is satisfied because the goods and services reflected in the Post-Petition Invoices were *actual and necessary operating inputs* that ColorArt used in its post-petition operations to fulfill its obligations to its own end customers. Salu Decl. ¶¶ 7–8, 19–20. Without those inputs — commercial printing, envelope manufacturing, bindery, fulfillment, and related production work — ColorArt could not have continued to perform under its existing customer commitments after the Petition Date or generated the corresponding post-petition customer revenue. Where, as here, a debtor in possession orders post-petition goods and services in the ordinary course and uses them to operate the business and preserve its going-concern value, the post-petition supplier's claim falls within the heartland of section 503(b)(1)(A). *See Reading*, 391 U.S. at 475, 483 (administrative

priority extends to "any … expense ordinarily attendant upon active participation in commercial or industrial life"); *Mammoth Mart*, 536 F.2d at 954 ("When third parties are induced to supply goods or services to the debtor-in-possession …, the purposes of [§ 503] plainly require that their claims be afforded priority."); *Calpine/O'Brien*, 181 F.3d at 532–33 (administrative status requires actual, concrete benefit to the estate).

The Claimants' evidentiary showing of benefit goes well beyond the customary representation that the work was performed and accepted. The matched downstream-billing detail set out in the table at Part II.C above and in **Exhibit H** to the Salu Declaration shows that, on the 79 Post-Petition Invoices for which the corresponding ColorArt customer invoices have been identified, ColorArt invoiced its own end customers in the aggregate amount of approximately **$1.27 million** — quantitative proof that the Claimants' work directly drove the estate's post-petition customer revenue. Salu Decl. ¶ 19 & Ex. H. The matched downstream billings corroborate that ColorArt accepted, used, and monetized the Claimants' work in the ordinary course; they are not the legal test of benefit, but they constitute concrete documentary evidence that the test is satisfied. *See Calpine/O'Brien*, 181 F.3d at 532–33 ("actual and necessary" requirement turns on concrete evidence, not general business-judgment rhetoric).

With respect to the 30 Post-Petition Invoices for which a matched downstream customer invoice has not yet been produced, the operating-inputs analysis is independently satisfied. Each such invoice identifies on its face the specific ColorArt end customer, job number, and/or purchase order to which the work relates, confirming that the goods or services were performed for an identified ColorArt customer order in the ordinary course of ColorArt's post-petition operations. Salu Decl. ¶¶ 8(d), 20 & Exs. A–F. Allowance does not require that every dollar of post-petition revenue be traced; it requires that the goods and services be "actual" and "necessary" operating inputs that preserved the estate — a standard met here. *See Reading*, 391 U.S. at 483; *Mammoth Mart*, 536 F.2d at 954.

To deny administrative status here would invert the rule of *Reading* and *Mammoth Mart*: the estate would have received the benefit of the Claimants' work — having collected, in respect of the matched subset alone, approximately **$1.27 million** from its own customers — while leaving the suppliers who made the work possible on equal footing with pre-petition general

unsecured creditors. That outcome is incompatible with the rehabilitative purpose of section 503(b). *See Abercrombie*, 139 F.3d at 757.

### IV.    ANCHOR GRAPHICS' POST-PETITION CARD RECEIPTS ARE INDEPENDENTLY ENTITLED TO ADMINISTRATIVE EXPENSE STATUS.

Anchor's claim for the **$77,517.40** in post-petition American Express card receipts retained by ColorArt rests on a related but independent theory. Pursuant to a pre-existing intercompany arrangement, ColorArt administered Anchor's American Express merchant processing through ColorArt's card-processing infrastructure, with the resulting settlement proceeds to be remitted to Anchor in the ordinary course. Salu Decl. ¶ 16(a). Between the Petition Date and April 1, 2026, ColorArt — in its capacity as debtor in possession — continued to process the proceeds of 87 American Express card transactions made by Anchor's customers, on Anchor's account, and retained those proceeds in the aggregate amount of **$77,517.40** without remitting them to Anchor. Salu Decl. ¶¶ 16–17 & Ex. G.

### A.    *Primary Theory: Administrative Expense Under Section 503(b)(1)(A).*

The Retained Card Receipts qualify for administrative expense priority under section 503(b)(1)(A) on the same two-part analysis applied to the trade invoices above. The relevant transaction — ColorArt's post-petition processing of Anchor's card receipts and retention of the resulting funds — occurred entirely after the Petition Date and was undertaken by ColorArt in its capacity as debtor in possession. Salu Decl. ¶¶ 16(b)–17. The retention of Anchor's funds conferred a direct and substantial benefit on the estate: those funds were available to, and used by, the estate in the ordinary post-petition operation of ColorArt's business. To leave Anchor uncompensated for that use would force Anchor to underwrite the estate's post-petition operations on the priority footing of a pre-petition general unsecured creditor, contrary to the rehabilitative purpose of section 503(b). *See Reading*, 391 U.S. at 482–85 (post-petition conduct of the debtor-in-possession giving rise to liability is an administrative expense); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 202–03 (1st Cir. 1985) (cited with approval in *Abercrombie*, 139 F.3d at 758); *Mammoth Mart*, 536 F.2d at 954. Both elements of the *Mammoth Mart* test are independently satisfied.

***B.        Alternative Theory: Non-Estate Property Subject to Turnover Under Sections 541(d) and 542.***

In the alternative, and without waiver of the primary theory, the Retained Card Receipts are properly characterized as funds in which Anchor holds the beneficial interest and which are therefore subject to turnover under section 542. Property rights in funds processed by one entity on behalf of another are determined under non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 55 (1979) (property interests are created and defined by state law unless a federal interest requires otherwise). Where, as here, an entity acts as a conduit or agent receiving and processing payments owed to a principal, the underlying funds are the property of the principal, not of the conduit, and may be excluded from property of the estate to the extent of the principal's equitable interest. *See* 11 U.S.C. § 541(d) (estate takes property subject to outstanding interests "to the extent of any equitable interest in such property that the debtor does not hold"); *Begier v. IRS*, 496 U.S. 53, 59 (1990) (funds held in trust for another are not property of the estate); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (estate succeeds only to the debtor's interest in property); *Mitsui Mfrs. Bank v. Unicom Comput. Corp. (In re Unicom Comput. Corp.)*, 13 F.3d 321, 324–25 (9th Cir. 1994) (funds mistakenly received by debtor were not property of the estate). To the extent the Retained Card Receipts remain identifiable in the estate's possession, Anchor is entitled to their turnover under 11 U.S.C. § 542.

The Court may grant administrative expense priority under the primary theory, or determine the Retained Card Receipts to be non-estate property under the alternative theory, or both, without disturbing the relief sought as to the trade-invoice component (Part III above). The Claimants' grounds for relief are pleaded in the alternative pursuant to Federal Rule of Bankruptcy Procedure 7008(a) and Federal Rule of Civil Procedure 8(d)(2)–(3) (as made applicable hereto).

## V.        RESERVATION OF RIGHTS.

The Claimants expressly reserve all rights, claims, defenses, causes of action, and remedies they may have against ColorArt or any other party, including, without limitation: (i) the right to supplement, amend, or further substantiate the underlying invoices and the matched downstream billing; (ii) the right to assert additional administrative expense claims (whether

11

arising under section 503(b)(1)(A), section 503(b)(9), or otherwise) against ColorArt for post-petition goods or services rendered after the date of this Motion or otherwise not yet billed; (iii) the right to assert that funds collected by ColorArt on Anchor's account are property of Anchor and not property of the estate; and (iv) any setoff, recoupment, or related rights as against ColorArt. Nothing herein or in this Motion shall be deemed a waiver, release, or limitation of any such rights, all of which are expressly preserved. Each Claimant's rights are reserved individually; nothing in this Motion shall be deemed to consolidate, merge, or otherwise affect the separateness of any Claimant's claims, rights, or interests.

## VI.    CONCLUSION.

WHEREFORE, the Claimants respectfully request that the Court enter an order substantially in the form attached hereto as **Exhibit A**: (i) allowing each Claimant's claim against the bankruptcy estate of ColorArt as a separate administrative expense under section 503(b)(1)(A) of the Bankruptcy Code in the respective amounts set forth in this Motion (with each allowance to be entered as a discrete finding against ColorArt's estate only); (ii) confirming the priority of each such allowed claim under section 507(a)(2); and (iii) granting such other and further relief as the Court deems just and proper.

DATED this 12th day of May, 2026.

**RIGGI LAW FIRM**

*/s/ David Riggi*
David Riggi, Esq.
Nevada Bar No. 4727
7900 W. Sahara Avenue, Suite 100
Las Vegas, NV 89117
Telephone: (702) 463-7777
Facsimile: (888) 306-7157
Email: riggilaw@gmail.com

*Counsel to Knepper Press Corporation,*
*Husky Envelope, LLC, Response Envelope, Inc.,*
*Southland Envelope, LLC, Anchor Graphics, and*
*Breese Publishing Company*